1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DANIEL JAY PEREZ,

               Plaintiff,

   v.

CALVIN COGBURN, et al.,

               Defendant.

CASE NO. 2:18-cv-01800-BAT

**ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

Plaintiff, Daniel Jay Perez, commenced this civil rights action pursuant to 42 U.S.C. § 1983. Dkt. 1. Plaintiff is a prisoner currently housed at the Monroe Correctional Complex, Special Offender Unit (MCC-SOU). *See* Dkt. 192. Plaintiff's current complaint names the Department of Corrections (DOC) and several DOC employees or former employees and alleges violations of his Fourteenth Amendment Due Process rights related primarily to his being housed in the close observation area (COA) at MCC-SOU in August 2018 and procedural violations in the proceedings related to the involuntary administration of psychiatric medication in February 2019. Dkt. 173. Before the Court is Defendants' amended motion for summary judgment (Dkt. 190) seeking dismissal of Plaintiff's fifth amended complaint (Dkt. 173). For the reasons below, Defendant's motion (Dkt. 190) is GRANTED and the matter is dismissed with prejudice.

*//*

1

## PROCEDURAL HISTORY

2      In December 2018, Plaintiff filed a pro se prisoner civil rights complaint under 42 U.S.C.

3  § 1983. Dkt. 4. After filing several amended complaints and significant motion practice related

4  to discovery and various other issues, Plaintiff retained counsel and during a scheduling

5  conference on August 13, 2021, the parties consented on the record to the jurisdiction of the

6  undersigned Magistrate Judge for all purposes in this case, including deciding any dispositive

7  motions and presiding over any trial. Dkt. 167. Plaintiff's counsel subsequently filed a fifth

8  amended complaint which is now the operative complaint in this action. *See* Dkt. 173. Plaintiff's

9  fifth amended complaint names the following as Defendants: the DOC; Tina Gregorious, Health

10  Services Manager (HSM) at MCC; Charlotte Joplin, administrative assistant to HSM Gregorious

11  at MCC; Calvin Cogburn, Advanced Registered Nurse Practitioner (ARNP) at MCC; Jack

12  Warner, Superintendent at MCC-SOU; Karie Rainer, DOC Director of Mental Health; Kathryn

13  Grey, supervisor in the Correctional Mental Health Unit at MCC; and Shelly Beck, health

14  records technician at MCC. *Id.* at 2-3.

15      Plaintiff's fifth amended complaint alleges:

16      1.  On August 7, 2018, Defendants required that Plaintiff accept medication under threat
         that he be placed in Close Observation Area if he did not accept medication.
17      2. Plaintiff submitted a grievance of this coercive condition on August 12, 2018.
        3. DOC staff including Defendants Warner and Rainer ratified this coercive condition
18      repeatedly in response to Plaintiff's subsequent grievances.
        4. In late January, 2019, immediately after Plaintiff discontinued voluntary medication,
19      DOC staff initiated a process for hearings to subject Plaintiff to involuntary medication.
        5. Under DOC policy, an inmate is required to be issued/served documents prior to an
20      involuntary medication hearing, to include the notice of hearing and a copy of the
        involuntary antipsychotic reports.
21      6. Within 24 hours, the inmate is to be served the Decision of Involuntary Antipsychotic
        Hearing Committee.
22      7. Within three working days of the hearing, the patient is to be provided with a copy of
        the Involuntary Antipsychotic Hearing Minutes and Receipt of Involuntary Hearing
        Committee Minutes and Appeal Procedures.
23      8. The patient has the right to appeal within 24 hours of receipt of these documents
        (excluding weekends and holidays).
        9. The appeal is made in writing to the Director of Mental Health.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 2

10. On February 6, 2019 at 8:40 a.m., Defendant Joplin served Plaintiff with a Notice of Involuntary Antipsychotic Hearing (24 Hour) on DOC Form 13-330.

11. The hearing was scheduled for February 7, 2019, at 10 a.m.

12. Also on February 6, 2019, Defendant Joplin served on Plaintiff the involuntary antipsychotic referrals (DOC Form 13-329) of Defendants Sanneh and Carsrud, both dated January 28, 2019.

13. On February 6, 2019, in preparation for his hearing, Plaintiff submitted to his primary therapist, Christine Pratt, CMHC3, several questions about his mental health condition.

14. Among her responses, Ms. Pratt expressed her belief that Plaintiff at the time was not a danger to himself or others.

15. On February 7, 2019, Plaintiff attended the involuntary medication hearing.

16. The hearing was attended by William Collins, Connie Sais, Eric Rosmith, Vilma K. Lamin Sanneh, and Daryl Singleton.

17. The hearing was audio recorded.

18. On February 7, 2019, about 11:30 a.m., Connie Sais served Plaintiff with the Decision of Involuntary Antipsychotic Hearing Committee, which ordered 14 days of involuntary medication.

19. On February 13, 2019, Plaintiff complained in writing to the Mental Health Director that he was not yet served the Involuntary Antipsychotic Hearing Minutes (DOC Form 13-502) or the Receipt of Minutes of Involuntary Antipsychotic Hearing Committee and Appeal Procedures (DOC Form 13-328).

20. In that complaint, Plaintiff also sought to appeal the committee's decision of February 7, 2021.

21. On February 14, 2019, at 9:13 a.m., Defendant Joplin served on Plaintiff a copy of the Receipt of Minutes of Involuntary Antipsychotic Hearing Committee and Appeal Procedures (DOC Form 13-328).

22. At the same time, Defendant Joplin also served on Plaintiff a copy of the 14-day Involuntary Antipsychotic Hearing Minutes (DOC Form 13-502).

23. This copy of the 14-day hearing minutes served on Plaintiff was missing signatures of William Collins and Connie Sais.

24. Also on February 14, 2019, Plaintiff submitted to Defendant Joplin on DOC Form 13-328 a signed notice of appeal of the 14-day Involuntary Antipsychotic Hearing decision of February 7, 2019.

25. On February 20, 2019, Defendant Joplin served on Plaintiff a 24-hour notice of a 180-day Involuntary Antipsychotic Hearing on DOC Form 13-330.

26. The copy of the 24-hour notice served on Plaintiff is signed by both Plaintiff and Defendant Joplin, who signed twice to attest that she both served the document on Plaintiff and read to him his hearing rights.

27. All three signatures were dated February 20, 2019. Plaintiff's signature reflects a time of 3:08 p.m.

28. Both of Defendant Joplin's signatures on this copy reflect a time of 2:55 p.m.

29. That notice on February 20, 2019, included an Involuntary Antipsychotic Report from each of Lamin Sanneh and Robert Carsrud on DOC Form 13-329.

30. On February 21, 2019, the audio recorded 180-day Involuntary Antipsychotic Hearing was held by a committee composed of William Collins, Eric Rosmith, Ashley Kennedy, and Connie Sais. Lamin Sanneh and Robert Carsrud attended as witnesses.

31. On February 21, 2019, about 3:30 p.m., Plaintiff received on DOC Form 13-327 the Decision of Involuntary Antipsychotic Hearing Committee ordering 180 days of involuntary medication.

32. On February 26, 2019, Defendant Joplin served on Plaintiff a copy of the Receipt of Minutes of Involuntary Antipsychotic Hearing Committee and Appeal Procedures (DOC

Form 13-328) pertaining to the hearing of February 21, 2019. Plaintiff also was served a copy of the 180-day Involuntary Antipsychotic Hearing Minutes and attached findings.

33. Plaintiff's copy of the minutes and attached findings for the hearing of February 21, 2019, contained signed statements of committee members Rosmith and Kennedy but was unsigned by Collins on his statement and by chairperson Kennedy on the decision of the committee.

34. This copy of the minutes also erroneously reflected a hearing time of 10:20 a.m. and noted in the first sentence that Defendant Joplin read Plaintiff his hearing rights on February 20, 2019, at 2:25 p.m.

35. On February 26, 2019, Plaintiff served on Defendant Joplin a type-written notice of appeal for the decision for 180 days of involuntary medication.

36. On March 7, 2019, Defendant Rainer upheld Plaintiff's appeal.

37. A review of Plaintiff's medical records (MR) maintained by DOC revealed many discrepancies between the documents maintained by DOC and the copies of the same documents served on Plaintiff related to the hearings of February 7 and 21, 2019.

38. Compared to what Plaintiff received, there are missing or altered documents in the medical records or among what was sent for his appeal.

39. The Medical Record (MR) version of the Health Services Kite dated January 14, 2019, by Plaintiff has a part with something crossed out and then initialed. The copy served on Plaintiff does not have this.

40. The MR version of the 14-day involuntary antipsychotic hearing minutes from February 7, 2019, is signed by Connie Sais and dated February 19, 2019, both on her individual statement supporting her hearing vote and separately as the committee chairperson declaring the decision of the whole committee.

41. In the MR version of the 14-day involuntary antipsychotic hearing minutes, the statement of William Collins is signed and dated February 14, 2019.

42. That statement of William Collins also is different than the unsigned version served on Plaintiff.

43. The single MR version of the Receipt of Minutes of Involuntary Antipsychotic Hearing Committee and Appeal Procedures for February 7, 2019, was the one signed by Plaintiff and dated February 14, 2019.

44. The copy of the same form on which Plaintiff wrote "I have not been served the minutes or appeal procedure" and which Plaintiff signed and dated February 13, 2019, was omitted from the DOC-maintained records.

45. The MR version of the Notice of Involuntary Antipsychotic Hearing (24-hour) dated February 20, 2019, was altered in the field reflecting the time that Defendant Joplin read Plaintiff his hearing rights, to falsely reflect that Plaintiff's rights were read at 2:25pm.

46. The MR version of the 180-day Involuntary Antipsychotic Hearing Minutes signed on February 27, 2019, by the chairperson shows a hearing time of 2:45 pm.

47. The MR version 180-day Involuntary Antipsychotic Hearing Minutes Statement of William Collins is signed and dated February 27, 2019. The body of this copy of Williams' statement is also different from the copy served on Plaintiff.

48. The MR version of Plaintiff two-page appeal dated February 26, 2019, was altered. The opening paragraph was removed, as were the numbers assigned the to second and third paragraphs.

49. In making these alterations, Defendant Joplin intentionally removed entirely the section of Plaintiff's appeal that made reference to Joplin's failure to comply with his Due Process rights in failing to read him his hearing rights at least 24 hours prior to the hearing.

50. The MR copy of this appeal with Joplin's unlawful redactions was sent by Defendant Joplin to Defendant Rainer and Bruce Gage on February 27, 2019.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 4

51. In response to Plaintiff's complaint that he was served different copies of documents maintained in DOC's medical records, DOC investigated the issues.

52. The DOC investigation concluded that several of the relevant documents appeared to have been altered and that Plaintiff was not provided with final copies of documents.

53. The DOC investigation found that documents were altered so that it "appeared" that time frames were met in order for an appeal to be denied, when the original copies show that documents were not provided or served within policy and therefore an appeal should have been upheld.

54. The DOC investigation also found that Plaintiff was also not given final versions of hearing minutes statements as to why he was placed on involuntary antipsychotic medications.

55. The DOC investigation concluded that these discrepancies were outside of policy.

56. The DOC investigation found that Plaintiff's appeal document itself was altered before it was sent to headquarters.

57. The DOC investigation concluded that Plaintiff would have had evidence to have his appeal granted if all documents were not altered.

58. During the DOC investigation, the investigator learned that Defendant Joplin was known to be frequently responsible for problems with paperwork pertaining to involuntary medication hearings.

59. Despite Defendant Joplin's frequent failures to properly administer paperwork for involuntary medication hearings, Defendants failed to properly supervise and train her to bring her practices into line with DOC policies and Due Process.

Dkt. 173 at 3-9.

Plaintiff alleges Defendants violated his Fourteenth Amendment Due Process rights: (1) by coercing Plaintiff to take unwanted psychiatric medication through threat of transfer to more restrictive housing in the COA; (2) through a policy and/or custom and practice of coercing Plaintiff to take unwanted psychiatric medication through threat of transfer to the COA; (3) by failing to observe Plaintiff's procedural rights before involuntary administration of medication; and (4) by failing to adequately train/supervise Defendant Joplin to respect Plaintiff's procedural Due Process rights in connection with an administrative hearing prior to ordering involuntary medication.[1] *Id.* at 10-11.

---

[1] The Court notes that for each of these claims Plaintiff's fifth amended complaint alleges Defendants acted "with deliberate indifference" in depriving Plaintiff of his liberty interest under the Due Process Clause of the Fourteenth Amendment. Dkt. 173. Plaintiff discusses Defendants' actions and liability only in the context of alleging a Fourteenth Amendment Due Process violation and does not explicitly allege a violation of the Eighth Amendment or any other constitutional right. *Id.* Accordingly, the Court analyzes Plaintiff's claims only under the Due Process Clause of the Fourteenth Amendment. *Id.*

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 5

As relief Plaintiff seeks monetary damages in an amount to be proven at trial, an award of taxable costs and attorney fees, and "such other relief as the court deems just and equitable." *Id.* at 11.

On January 21, 2021, Defendants filed the instant motion for summary judgment seeking dismissal of the fifth amended complaint. Dkt. 190. Plaintiff filed a response to the motion including a declaration from Plaintiff,[2] and Defendant filed a reply. Dkts. 191, 194.

## STATEMENT OF MATERIAL FACTS

### A.   Monroe Correctional Center – Special Offender Unit (MCC-SOU)

The MCC is comprised of several separate units including the SOU which is specifically designated for the treatment and housing of vulnerable adult male incarcerated individuals due to serious and chronic mental illness, or who are seriously mentally ill. Dkt. 188, Decl. of Karie Rainer at ¶ 4. Each of the six housing units within SOU provides a specialized treatment setting for incarcerated individuals with multi-disciplinary teams of medical, mental health, and custody staff working together to provide round-the-clock services. *Id.* The goal of the inpatient residential care is to stabilize the incarcerated individual and once stable, transition them to a less restrictive environment within the DOC prison system until their release with the goal of successful transition and release into the community. *Id.* at ¶ 5. Pursuant to the DOC Offender

---

[2] The Court notes that the copy of Plaintiff's declaration in the record is not signed by Plaintiff under penalty of perjury but is instead signed by counsel. Dkt. 192. Plaintiff's counsel filed a declaration on April 18, 2022, stating that Plaintiff had read and approved the declaration by phone and email and had mailed back a signed copy of the declaration, but that it had not arrived at counsel's office by April 18, 2022, the date opposition to the summary judgment motion was due. Dkt. 193. Counsel's declaration states that he applied an electronic signature to Plaintiff's declaration and would file the original signature with a praecipe when it arrived. *Id.* However, the version of the declaration signed by Plaintiff does not appear to have ever been submitted. The Court notes that unsigned declarations generally are not admissible evidence in considering a motion for summary judgment. *See generally* 28 U.S.C. § 1746. However, even if the Court considers the unsigned declaration of Plaintiff, it finds Defendants are entitled to summary judgment.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 6

Health Plan, DOC provides all incarcerated individuals housed within its facilities with medical, dental and mental health care that is "medically necessary." *Id.* at ¶ 6. Incarcerated individuals may receive mental health treatment based on the severity of their disorder as determined by a mental health provider. *Id.* These services include screening and assessment, evaluation, staff consultations, medications (voluntary or involuntary), counseling, suicide prevention, crisis stabilization, transitional, residential, acute and outpatient care. *Id.*

**B.      Plaintiff's August 2018 Placement in the Close Observation Area (COA)**

DOC Policy 320.265 documents the procedures for placement of an incarcerated individual in a COA when the individual poses a risk to themselves or others or has a mental health concern resulting in a grave disability. Dkt. 186, Decl. of Calvin Cogburn at ¶ 3 and Ex. 1. The policy in effect during the relevant period provides, "placement on close/continuous observation status will be determined by a mental health provider based upon an assessment by health services employees/contract staff. Status will continue until the offender has been determined to be safe in a less restrictive environment by a mental health provider." *Id.* at Ex. 1. The policy provides that offenders may be placed in the COA for the following reasons: risk of self-harm; risk of suicide; self-harm attempt; suicide attempt; severe psychiatric decompensation. *Id.* The policy provides that "offenders will not be released from close observation status until a mental health provider has evaluated and briefed the offender and determined s/he presents minimal imminent risk of self-injury, and an aftercare plan is developed using DOC 13-371 Suicide Intervention Inventory." *Id.*

During August 2018, Plaintiff was receiving care from Defendant Cogburn. *Id.* at ¶ 2. In a treatment note dated August 1, 2018, Defendant Cogburn stated that Plaintiff had refused his psychotropic medication for four days. *Id.* at ¶ 4 and Ex. 2. The treatment note stated Plaintiff

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 7

endorsed auditory hallucinations, command type, instructing himself to hurt himself, and he admitted to isolating himself in his cell on Sunday[3], to refrain from cutting his left arm. *Id.* The treatment note states Plaintiff also noted having a history of auditory hallucinations to hurt himself/others, paranoia, and delusions, and that Plaintiff stated "maybe" he would seek help if he experienced suicidal ideation/homicidal ideation. *Id.* The treatment note indicates that Plaintiff stated he felt "stable" psychiatrically. *Id.* at ¶ 4 and Ex. 2. The treatment note also states that,

> in the past, off meds, pt. has murdered a cell-mate and attempted to murder a second inmate based on his paranoia. He acknowledges that his paranoia increases when he has been off meds in the past, but this does not mitigate his decision to stop taking his meds. Impression – schizoaffective disorder. Plan – meet w/ counselor/CUS to encourage med compliance. If not effective place in COA for safety.

*Id.*

Defendant Cogburn states in his declaration that based on Plaintiff's status on August 1, 2018, he made the decision to place Plaintiff in a COA. *Id.* at ¶ 4. Defendant Cogburn further states that he saw Plaintiff on August 2, 2018, in the COA approximately 30 minutes after his admission to the COA. *Id.* In a treatment note dated August 2, 2018, Defendant Cogburn stated that Plaintiff presented as moderately irritated, verbalizing that he was upset about being admitted to the COA. *Id.* He emphasized, "I am doing fine! I haven't hurt myself or anyone else." *Id.* Defendant Cogburn states he readdressed Plaintiff's belief that secondary to his psychiatric stability, he could discontinue his medication. *Id.* After several minutes of psychoeducation, Defendant Cogburn states that it became clear that Plaintiff did not understand the correlation (in his case) between his psychiatric symptoms decreasing and taking his psychotropic medication. *Id.* at ¶ 5.

---

[3] The Court notes that it appears Sunday's date would have been July 29, 2018.

1    Psychologist Nora Bloomingdale also noted in a treatment note dated August 2, 2018,

2    that Plaintiff presented as irritable and argumentative and demonstrated limited insight into the

3    connection between his noncompliance with his medication and his behaviors, etc., while on

4    medication. *Id.* at ¶ 6 and Ex. 12. The treatment note reflects Dr. Bloomingdale also encouraged

5    Plaintiff to be medication compliant. *Id.* A "Conditions of Confinement" note from Plaintiff's

6    health records authored by Defendant Cogburn again describes Plaintiff's reason for placement

7    in the COA as "risk of self-harm", noting that he asked for a four-hour cell confinement on July

8    31, 2018, as "I intensely wanted to cut my left arm," and on August 1, 2018, stated "maybe"

9    when asked if he would ask staff for help if experiencing suicidal or homicidal ideation. *Id.* at ¶ 7

10   and Exhibit 4. The note also reflects again that Plaintiff has a history of murdering a cellmate and

11   attempting to murder another offender and that the "goal" was to adjust his medications as

12   necessary to mitigate increase in paranoia and self-harm ideation. *Id.*

13   Defendant Cogburn states in his declaration that the treatment notes reflect that on

14   August 6, 2018, Plaintiff was taking his medications voluntarily. *Id.* at 8 and Ex. 5. A treatment

15   note dated August 6, 2018, reflects that Dr. Bloomingdale encouraged Plaintiff to continue with

16   his medication compliance. *Id.* Defendant Cogburn states in his declaration, and in a treatment

17   note dated August 7, 2018, that he saw Plaintiff in the COA on August 7, 2018, at which point

18   Plaintiff was taking his medication as prescribed and agreed to continue taking his medication

19   voluntarily. *Id.* The treatment note reflects that Plaintiff denied hallucinations, had no paranoia

20   during Defendant Cogburn's interaction with him, and denied suicidal or homicidal ideation or

21   sub-lethal intent to self-harm. *Id.* The treatment note reflects that Plaintiff was appropriate,

22   respectful, and had organized thoughts. *Id.* at ¶ 9. Plaintiff was released from the COA on August

23

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 9

7, 2018, after which Defendant Cogburn continued to provide Plaintiff with mental health treatment in 2018. *Id.* at ¶¶ 10-11 and Ex. 7.

Plaintiff filed a grievance dated August 12, 2018, challenging Defendant Cogburn's alleged statement to him on August 7, 2018, that he would not be released from the COA unless he took his medication as directed. Dkt. 187, Decl. of Jordan McKinney at 60. This grievance was assigned Grievance Log I.D. No. 18662018. *Id.* at 2 & 60-63. Plaintiff's grievance was found to be non-grievable by non-Defendant Grievance Coordinator Peter Maxon as the substance of the grievance related to Plaintiff's conditions of confinement, an issue which has a separate review process. *Id.* The non-grievable determination was upheld on appeal by non-Defendant MCC Grievance Program Manager Dale Caldwell, and the grievance was closed at Level 0. *Id.*

Plaintiff filed a grievance dated August 16, 2018, challenging alleged statements by Defendants Cogburn, Grey, and non-Defendants Christine Pratt and Dr. Brown, on August 14, 2018, that if he did not take his medication voluntarily, he would be placed in the COA.[4] *Id.* at 2, 4 & 40. This grievance was assigned grievance Log I.D. No. 18662186. *Id.* at 4. At Level II of the grievance, the response was signed by Superintendent Jack Warner. *Id.* at 41. At Level III, the response was drafted by Director of Mental Health Karie Rainer. *Id.* at 42 & 49. At both Level II and Level III, the responses were to concur, after an investigation, with the Level I finding which was that DOC policy was followed on August 14, 2018, and Plaintiff's health and safety were the priority. *Id.* at 41 & 49.

//

---

[4] The Court notes that Plaintiff's fifth amended complaint does not challenge Defendant Cogburn's or Defendant Grey's actions on August 14, 2018, but is limited to Defendant Cogburn's alleged statement on August 7, 2018. Dkt. 173.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 10

**C.      Plaintiff's Involuntary Antipsychotic Hearings (IAH) in February 2019**

In the event an incarcerated individual's mental health disorder requires treatment with antipsychotic medication, an attempt will be made to obtain consent (if the incarcerated individual is capable of giving valid informed consent) before proceeding with the proposed treatment. Dkt. 188 at ¶ 7. However, if the incarcerated individual refuses to consent to treatment, the treatment provider may move for involuntary antipsychotic administration. *Id.* Pursuant to DOC Policy 630.540, a request for emergency administration of involuntary antipsychotic medication may be ordered for the incarcerated individual by a licensed physician, Advanced Registered Nurse Practitioner (ARNP) or Physician Assistant for a maximum of 72 hours without conducting an Involuntary Antipsychotic Hearing (IAH). *Id.* at ¶ 8 and Exs. 1 & 2. The staff must determine the incarcerated individual's condition constitutes an emergency because the incarcerated individual is suffering from a mental disorder, presenting an imminent likelihood of serious harm to self or others, including failure to care for self if the harm is imminent and unlikely to respond to less restrictive medically acceptable alternatives or such alternatives are not available or have not been successful. *Id.*

Administration of involuntary medication for more than 72 hours for a single emergency will require an IAH. *Id.* at ¶ 9 and Exs. 1 & 2. The treating provider may request a 14 Day IAH from the Director of Mental Health or designee. *Id.* The Director will appoint the IAH Committee which will include a chairperson who is a non-treating clinician with a master's degree or above in a clinical field or an employee in a supervisory position, a non-treating psychiatrist, and non-treating psychologist. *Id.* The treating psychiatrist or psychiatric ARNP/PA and the treating mental health professional/psychologist each prepare a report for the IAH Committee which will include the basis of the request, diagnosis, disturbed behavior and mental

status, recommended antipsychotic(s), methods used to encourage voluntary adherence, voluntary and involuntary medication history and a description of the less intrusive treatment alternatives considered or attempted. *Id.* The hearing will be scheduled no later than 7 calendar days following appointment of the IAH Committee. *Id.* At the IAH hearing, the incarcerated individual has the right to attend and be heard, present limited testimony through witnesses and to cross-examine witnesses called by the facility, have a competent lay advisor and to be informed of the evidence relied upon for the proposed involuntary treatment. *Id.* at ¶ 10.

After a presentation of the evidence, the IAH Committee will then make a determination which must be a majority vote, although the non-treating psychiatrist must vote in favor of involuntary antipsychotic medication administration for it to be approved. *Id.* A hearing summary will be completed by the IAH Committee chairperson and include a summary of the evidence relied upon, whether mental illness is present and its nature, and if mental illness is present, whether it is related to a likelihood of serious harm or grave disability. *Id.* There will also be documentation of any imposed limitations on the antipsychotic medications that may be prescribed. *Id.* The incarcerated individual will receive a copy of the decision which will also be sent to the Director of Mental Health for review and signature. *Id.*

A 180 day IAH will be conducted if the treating provider recommends that the involuntary medication continue longer than 14 consecutive days. *Id.* at ¶ 11. The IAH Committee will meet prior to the termination of the 14 day involuntary treatment order. *Id.* The procedures for the 180 day IAH follow the same procedures as the 14 day IAH. *Id.* The same process will be followed if the treating provider refers the incarcerated individual for a subsequent 180 day IAH. *Id.*

A patient may also appeal the IAH Committee decision, with the appeal made to the Director of Mental Health in writing. *Id.* at ¶ 12. The Director of Mental Health reviews all appeals and makes a determination on whether the required procedures were followed. *Id.* If the required procedures were not followed, the Director can convene a new committee. *Id.*

ARNP Lamin Sanneh, Plaintiff's provider as of about December 11, 2018, referred Plaintiff for involuntary antipsychotic medications at the end of January 2019. Dkt. 189, Decl. of Lamin Sanneh at ¶¶ 2-3. In making this referral, ARNP Sanneh states in his declaration that he first consulted with other providers, Plaintiff's mental health counselors and anyone who knew him or might have an encounter with him either individually or during treatment team meetings. *Id.* at ¶¶ 3-5. Plaintiff's 14 day Involuntary Antipsychotic Hearing was held on February 7, 2019, and Plaintiff attended the hearing. *See id.* at 8-9 (Hearing Minutes). The Committee decided to administer 14 days of involuntary medication, and Plaintiff appealed the decision. *Id.* at ¶ 6 and Ex. 1.

Plaintiff's appeal was forwarded to former Chief of Psychiatry Dr. Gage by Defendant Joplin on February 14, 2019, with addenda sent the next day, noting problems in serving paperwork and getting minutes signed related to inclement weather but stating that she wanted to get the appeal to Dr. Gage as soon as she could. *Id.* at 5. ARNP Sanneh states that the appeal was denied, and Plaintiff proceeded to have a 180-day Involuntary Antipsychotic Hearing on February 21, 2019. *Id.* at ¶ 6.

After Plaintiff had a 180-day IAH on February 21, 2019, he appealed the Committee's finding to place him on involuntary medication. Dkt. 188 at ¶ 14 and Ex. 3. Defendant Rainer reviewed the appeal. *Id.* Through email, Defendant Rainer asked about the qualifications of the IAH Committee chair, and Defendant Joplin responded that the Chair, Ashley Kennedy, held a

Bachelor's degree. *Id.* Defendant Rainer later sent an email to Dr. Gage noting that the Chair didn't meet the educational requirements per policy and asking whether that would be enough to uphold Plaintiff's appeal. *Id.* at ¶ 15 and Ex. 4. Ultimately, Defendant Rainer upheld Plaintiff's appeal, which had the effect of overturning the decision of the IAH Committee to administer 180 days of involuntary medication, because the Chairperson of the Committee did not meet the requirements in DOC 630.540 of being a clinician with a Master's degree or in a supervisory position. *Id.* at ¶ 16 and Ex. 5.

**D.      Plaintiff's Kites and Grievance Related to His Medical Records, and DOC Investigation**

In or around August 2018, Plaintiff submitted a kite to records technician Defendant Shelley Beck noting discrepancies between the documents he was served related to his IAH hearing and appeal, and those in his DOC medical records and asking that the medical records be "corrected." Dkt. 192, Decl. of Daniel Perez, at 12-13 & 58. Defendant Beck responded to the kite stating that:

> Your provider will not be correcting any of the paperwork for the last year. If you have a concern it should be done within the 24 hours of the note being written. At this time it is illegal for your provider to go back and make any corrections that you are requiring. If you want to address this issue you may write a statement as to why you disagree with the entries. We can put this in your chart but will not make any corrections to the notes themselves. When you write your statement you must put your name and DOC# as well as the specific date that you're disagreeing with and why with each correction you are addressing. If you have any questions feel free to contact me.

*Id.* Plaintiff subsequently submitted Grievance Log ID No. 20716476 relating to this issue. *Id.* at 59-64. In response to that grievance a DOC investigation was conducted by non-Defendant Rachel Symon during which Defendant Beck was interviewed. *Id.*

The grievance investigation report noted largely the same discrepancies challenged by Plaintiff in his fifth amended complaint. *Id.*; Dkt. 173. Namely, the report found:

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 14

There are in fact missing or altered documents in comparison to what Mr. Perez received or submitted, vs. what is in the chart or what was sent for his appeal.

- Health Services Kite dated 1/14/19 by Daniel Perez to mental health, responded to by Dr. Lamin Sanneh on 1/17/19. The Medical Record (MR) version has a part with something crossed out and then initialed. The "offender copy" that Daniel Perez (DP) received, does not have this. * This could have been something written on accident after the fact and does not seem like something that was being hidden but may have been written on the wrong kite by mistake. It was crossed out once and initialed in an appropriate manner.
- The MR version of the 14 Day involuntary antipsychotic hearing minutes statements dated 2/7/19 by Connie Sais is signed and dated. The DP version is not the final version; not signed and dated.
- The MR version of the 14 day involuntary antipsychotic hearing minutes statements dated 2/7/19 by Dr. William Collins is signed and dated. The DP version is not the final version; not signed and dated and says something COMPLETELY different than the MR version.
- The MR version of the 14 day involuntary antipsychotic hearing minutes dated 2/7/19 by Connie Sais is signed and dated. The DP version is not the final version; not signed and dated.
- Mr. Perez had 2 versions of the Receipt of Minutes of Involuntary Antipsychotic Hearing Committee and Appeal Procedures forms. One that he altered and sent back, stating, "I have not been served the minutes of appeal procedure. This form was signed and dated by Mr. Perez on 2/13/19. The updated form with his signature was in the chart for the same hearing and appeal.
- The MR version of the Notice of Involuntary Antipsychotic Hearing (24 hour) dated 2/21/19 appears to have been altered; has a strange mark that is not on the copy that DP was provided. The DP version notes 2:55PM. It appears there was later a correction to the time of 2:35pm by Charlotte Joplin on the MR version. *The time stamp for this form is particularly important for the appeal part of the process.
- The MR version of the 180 day Involuntary Antipsychotic Hearing Minutes dated 2/21/19 has a time stamp of 2:45pm. The copy given to DP was time stamped 10:20AM. The MR version has a signature and date on it by Connie Sais. The DP version is not signed.
- The MR version of the 180 day Involuntary Antipsychotic Hearing Minutes Statement dated 2/21/19 by Dr. Collins is signed and the body of the statement is COMPLETELY different than the version that DP was provided; his also had no signature.
- The MR version of the Decision of Involuntary Antipsychotic Hearing Committee dated 2/21/19 has all required signatures. The DP version has signature missing.
- Mr. Perez was provided an appeal form on 2/26/19. Mr. Perez submitted a written appeal statement. This statement is also in the MR. ****Mr. Perez received a copy of what was sent to Headquarters (HQ) for his appeal (sent by Charlotte Joplin to Dr. Karie Rainer and Dr. Bruce Gage on 2/27/19). This version of the document was altered. It appears that a section was whited out as well as a few numbers. When flipping to the next page, the numbers reappear beginning with 4. What Mr. Perez sent for his appeal is not what was sent to HQ. The missing portion on the original, which again, is in the chart, states, "1) I was not given a full 24 hours notice of my hearing. My hearing was held at 2:35pm and I was not served until 2:55pm on 2/20/19." "This goes back to the altered form Notice of Involuntary Antipsychotic hearing (24 hour) dated 2/21/19 where the time was altered.
- DP version of a Health Services Kite dated 3/21/19 by Daniel Perez to Tina Gregorious, responded to by Charlotte Joplin on 3/22/19. This is not in the chart. Per RHIT Shelley Beck and the Health Services Kite itself, "This form (the HS kite) must be filed if any

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 15

information is entered below (in the Health Services Response) except for: simple prescription refills, finance, non-medical, work/bunk change, religious diets, shoes, classification, non-health services issues. This kite is specific to items that go into the legal section, and is therefore not required to be filed.

*Id.* The report makes the following conclusion:

Substantiated. As noted above, several documents appear to have been altered and Mr. Perez was not provided with final copies of documents. Documents were altered so that it "appeared" that time frames were met in order for an appeal to be denied, when the original copies show that documents were not provided or served within policy and therefore an appeal should have been granted. Mr. Perez was also not given final versions of hearing minutes statements as to why he was placed on involuntary antipsychotic medications. This is outside of policy. Mr. Perez's appeal document itself was altered before it was sent to HQ. From all the documents reviewed, we would have had evidence to have this appeal granted if all documents were not altered.[5]

*Id.* The report further recommends the following response:

Mr. Perez, it does in fact appear that you were served documents that were then altered prior to being placed in the medical chart and or you were not given final copies of documents. It also appears that your appeal request was altered prior to sending it to HQ for review; which may have directly resulted in your appeal being denied.[6] We take this seriously and this information, along with your copies and medical records copies will be forwarded to the attorney General's (AGs) office for further review. In speaking with RHIT Shelley Beck and reviewing DOC 640.020, you can send any documentation that you wish to be added to your record with a note explaining why to RHIT Shelley Beck. She will add this to the Correspondence section of the chart as discussed. Additionally, a note will be placed in the Legal section of the chart to refer to the Correspondence section for further information so that others will be alerted that there is further documentation to review.

*Id.*

## DISCUSSION

### A.    Relevant Legal Standards

To prevail on a Section 1983 claim, the plaintiff must establish (1) that he suffered a

violation of a right protected by the Constitution, and that (2) the violation was proximately

---

[5] The Court notes that, as Defendants point out, this finding refers to the alleged alterations made to the appeal paperwork for Plaintiff's 180 day IAH hearing, the determination of which was in fact overturned on appeal on a separate ground than those identified in the appeal paperwork. Dkt. 188 at 5-6.

[6] As noted above, the appeal of the 180 day IAH decision referred to here was, in fact, upheld.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 16

1  caused by a person acting under color of state law. *Crumpton v. Gates*, 847 F.2d 1418, 1420 (9th

2  Cir. 1991). To satisfy the second prong, the plaintiff must allege facts showing how individually

3  named defendants caused, or personally participated in causing, the harm alleged in the

4  complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).

5       The Court shall grant summary judgment if the movant shows that there is no genuine

6  dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R.

7  Civ. P. 56(a). The moving party has the initial burden of production to demonstrate the absence

8  of any genuine issue of material fact. *Id.*; *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

9  2001) (en banc). A genuine dispute concerning a material fact is presented when there is

10  sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*

11  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 253 (1986). A "material" fact is one which is "relevant

12  to an element of a claim or defense and whose existence might affect the outcome of the suit,"

13  and the materiality of which is "determined by the substantive law governing the claim." *T.W.*

14  *Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). When the

15  Court considers a motion for summary judgment, "[t]he evidence of the non-movant is to be

16  believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson*, 477 U.S. at

17  255. A nonmoving party's failure to comply with local rules in opposing a motion for summary

18  judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to

19  judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

20       "If the moving party shows the absence of a genuine issue of material fact, the non-

21  moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine

22  issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex*

23  *Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). The non-moving party may not rely upon mere

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 17

allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party is required to present specific facts, and cannot rely on conclusory allegations. *Hansen v. U.S.*, 7 F.3d 137, 138 (9th Cir. 1993). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (internal citation and quotation marks omitted). The court must determine whether the specific facts that are presented by the non-moving party, considered along with undisputed context and background facts, would show that a rational or reasonable jury might return a verdict in the non-moving party's favor based on that evidence. *Emeldi v. University of Oregon*, 698 F.3d 715, 728-29 (9th Cir. 2012).

"The due process clause of the Fourteenth Amendment substantively protects a person's rights to be free from unjustified intrusions to the body, to refuse unwanted medical treatment, and to receive sufficient information to exercise these rights intelligently." *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (citing *White v. Napoleon*, 897 F.2d 103, 111 (3rd Cir. 1990)) (internal citations omitted). Specifically, inmates possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-222 (1990). Substantive due process is satisfied, and a state may treat an inmate who has a serious mental illness with involuntary psychotropic medication, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest. *Id.* at 227. Further, the involuntary administration of antipsychotic medications "cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's interests are taken into account." *Id.* at 233. Thus, in the context of involuntary antipsychotic medication, procedural due process is satisfied if the

1   inmate is provided with notice, the right to be present at an adversarial hearing, and the right to

2   present and cross-examine witnesses. *Id.* at 235. Appointment of counsel is not required because

3   a lay advisor who understands the psychiatric issues involved sufficiently protects an inmate's

4   due process rights. *Id.* at 236. Such procedural mechanisms adequately protect the Fourteenth

5   Amendment rights of inmates, even when the ultimate substantive decision to medicate is left to

6   medical personnel and not the court. *Id.* at 231.

7   An inmate's liberty interests are "adequately protected, and perhaps better served, by

8   allowing the decision to medicate to be made by medical professionals rather than a judge." *Id.*

9   at 231. By leaving the decision to medicate in the hands of an inmate's mental health providers,

10  the court is able to avoid "unnecessary intrusion into either medical or correctional judgments[.]"

11  *Vitek v. Jones*, 445 U.S. 480, 496 (1980). The court gives "deference … to medical professionals

12  who have the full-time responsibility of caring for mentally ill inmates" because those

13  professionals "possess, as courts do not, the requisite knowledge and expertise to determine

14  whether [antipsychotics] should be used in an individual case." *Harper*, 494 at 230 n.12. Because

15  "[t]he risks associated with antipsychotic drugs are for the most part medical ones," the decision

16  to medicate is "best assessed by medical professionals." *Id.* at 233.

17  In *Kulas v. Valdez*, 159 F.3d 453 (9th Cir. 1998), the Ninth Circuit inferred that the due

18  process procedural protections described in *Harper* may not be applicable when an emergency

19  situation exists requiring the involuntary administration of an antipsychotic medication. Citing

20  the Fourth Circuit's opinion in *Hogan v. Carter*, 85 F.3d 1113 (4th Cir. 1996) which found such

21  an emergency exception, the Ninth Circuit noted that, unlike in *Hogan*, "[t]here is no evidence

22  that Kulas posed such an imminent and serious danger to himself or others that the minimal

23  procedural requirements of *Harper*-notice and right to be present at and participate in a hearing-

could not be met." *Kulas*, 159 F.3d at 456.

In *Hogan*, a doctor "personally familiar with Hogan, his mental disorder, and his prior treatment, determined, pursuant to and consistent with accepted professional judgment, that it was in Hogan's medical interest to receive the one-time dose of Thorazine in order to protect Hogan from *imminent, self-inflicted harm.*" 85 F.3d at 1117 (internal citation omitted) (emphasis added). The Fourth Circuit reversed the district court's decision denying the doctor's motion to dismiss and remanded the matter with instructions to enter judgment for the defendant doctor. *Id.* at 1118-19. The Fourth Circuit commented:

> If Dr. Carter had not ordered the single dose of Thorazine that he did order, and instead delayed emergency medical intervention until after Hogan had been afforded the predeprivation hearing to which the district court held Hogan was entitled, it is not unlikely that Dr. Carter would now be facing a lawsuit by Hogan claiming that he was deliberately indifferent to his serious medical needs. That Dr. Carter should not be liable for taking the very action, the failure of which to take could have exposed him to such a lawsuit, should come as no surprise.

*Id.* In *Kulas*, the Ninth Circuit noted that, in contrast to *Hogan*, the inmate-patient was "merely loud and uncooperative." *Kulas*, 159 F.3d at 456. The Court determined that behavior by an inmate that was merely loud and uncooperative was insufficient to establish an emergency circumstance such that "the minimal procedural requirements of *Harper* – notice and the right to be present at and participate in a hearing – could not be met." *Id.*

## B.    DOC as a Defendant

Plaintiff names the DOC as a Defendant. Dkt. 173. Defendants move for summary judgment arguing the DOC is not a proper defendant in this action. Dkt. 190. The DOC, an agency of the State of Washington, is not a "person" for purposes of a § 1983 civil rights action, nor is the State of Washington itself. *See Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 65, 71 (1989); *Maldonado v. Harris*, 370 F.3d 945, 951 (9th Cir. 2004). Thus, the DOC cannot

be sued under § 1983. Additionally, to the extent Plaintiff's fifth amended complaint could be construed as brought against the State of Washington, the Court notes that there is no evidence the State of Washington has waived its Eleventh Amendment immunity in federal courts. Plaintiff does not oppose or otherwise address this branch of Defendants' motion for summary judgment in his response to the motion. *See* Dkt. 191. Accordingly, Plaintiff fails to state a claim against Defendant DOC or the State of Washington.

Defendants' motion for summary judgment is granted with respect to Defendant DOC and all claims against Defendant DOC are dismissed with prejudice.

**C.    August 2018 Period Housed in the COA (Claims 1 & 2)**

Plaintiff alleges Defendant Cogburn violated his Due Process rights when, on August 7, 2018, he "coerced" Plaintiff into taking unwanted psychiatric medication orally by informing him that he would never be released from the COA unless he took his medications as directed.[7] Dkt. 173 at 3 & 10. Plaintiff further alleges Defendants Warner and Rainer ratified this coercive condition by denying Plaintiff's grievances. *Id.*

In support of their motion for summary judgment, Defendants submit evidence including a declaration from Defendant Cogburn and several treatment notes. *See* Dkt. 186. A treatment

---

[7] The Court notes that Plaintiff's fifth amended complaint does not allege that his initial placement in the COA violated Due Process and accordingly the Court does not address this issue as a separate claim but considers the evidence submitted with respect to that initial placement as background information. The Court also notes that in his brief and declaration in opposition to Defendants' motion for summary judgment, Plaintiff also refers to another instance on August 14, 2018, where Defendant Cogburn allegedly told Plaintiff he would be taken back to the COA if he refused to take his medication orally. Dkt. 192 at 5; Dkt. 191 at 4-5. However, Plaintiff also does not include this as a separate claim in his fifth amended complaint and, accordingly, the Court does not consider it as such but will consider it as background information. *Wasco Prods., Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory... [...] summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (internal citation and quotation marks omitted); *see also Trishan Air, Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 435 & n.19 (9th Cir. 2011) (concluding plaintiff's claim "was not properly before the district court" where plaintiff first raised it in opposition to summary judgment).

note dated August 1, 2018, authored by Defendant Cogburn states that Plaintiff had refused his

psychotropic medication for four days, that Plaintiff stated he felt "stable" but that he also

endorsed auditory hallucinations, command type, instructing himself to hurt himself, and he

admitted to isolated himself in his cell on July 29, 2018, to refrain from cutting his left arm. *Id.* at

¶ 4 and Ex. 2. The treatment note also states that Plaintiff also noted having a history of auditory

hallucinations to hurt himself/others, paranoia, and delusions, and that Plaintiff stated "maybe"

he would seek help if he experienced suicidal ideation/homicidal ideation. *Id.* The treatment

notes states that,

> in the past, off meds, pt. has murdered a cell-mate and attempted to murder a second
> inmate based on his paranoia. He acknowledges that his paranoia increases when he has
> been off meds in the past, but this does not mitigate his decision to stop taking his meds.
> Impression – schizoaffective disorder. Plan – meet w/ counselor/CUS to encourage med
> compliance. If not effective place in COA for safety.

*Id.*

Defendant Cogburn states in his declaration that based on Plaintiff's status on August 1,

2018, he made the decision to place Plaintiff in a COA. *Id.* at ¶ 4. Defendant Cogburn further

states that he saw Plaintiff on August 2, 2018, in the COA approximately 30 minutes after his

admission to the COA. *Id.* A treatment note dated August 2, 2018, authored by Defendant

Cogburn states that Plaintiff presented as moderately irritated, verbalizing that he was upset

about being admitted to the COA and that he emphasized, "I am doing fine! I haven't hurt myself

or anyone else." *Id.* The treatment note states that Defendant Cogburn readdressed Plaintiff's

belief that secondary to his psychiatric stability, he could discontinue his medication and that

after several minutes of psychoeducation, Defendant Cogburn states that it became clear that

Plaintiff did not understand the correlation (in his case) between his psychiatric symptoms

decreasing and taking his psychotropic medication. *Id.* at ¶ 5.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 22

1    Defendants also submit a treatment note dated August 2, 2019, from non-Defendant

2    psychologist Nora Bloomingdale in which she states that Plaintiff demonstrated limited insight

3    into the connection between his noncompliance with his medication and his behaviors, etc.,

4    while on medication and that she encouraged Plaintiff to be medication compliant. *Id.* at ¶ 6 and

5    Ex. 3. A "Conditions of Confinement" note from Plaintiff's health records dated August 2, 2018,

6    authored by Defendant Cogburn also describes the reason for Plaintiff's placement in COA as

7    risk of self-harm, noting that he asked for a four-hour cell confinement on July 31, 2018, as "I

8    intensely wanted to cut my left arm," and on August 1, 2018, stated "maybe" when asked if he

9    would ask staff for help if experiencing suicidal or homicidal ideation. *Id.* at ¶ 7 and Ex. 4.

10   Defendant Cogburn states that notes from Plaintiff's medical chart indicated that he took his

11   medications on August 6, 2018. *Id.* at ¶ 8, and Ex. 5. The medical chart note by Nora

12   Bloomingdale dated August 6, 2018, states that she "encouraged pt to continue medication

13   compliance." *Id.* at Ex. 5.

14   Defendant Cogburn further states that he saw Plaintiff in the COA on August 7, 2018, "at

15   which point he was taking his medication as prescribed and agreed to continue taking his

16   medication voluntarily." *Id.* at ¶ 9. Defendant Cogburn's primary encounter report from that date

17   states that Plaintiff denied suicidal hallucinations, had no paranoia during the interaction, denied

18   suicidal or homicidal ideation or sub-lethal intent to self-harm, was appropriate, respectful and

19   had organized thoughts. *Id.* Defendant Cogburn states Plaintiff was released from the COA that

20   same day.  *Id.* at ¶ 10.

21   Plaintiff, in opposition, submits his own declaration stating that on August 1, 2018, he

22   discussed his decision to stop taking medication with Defendant Cogburn. Dkt. 192, at ¶¶ 12 &

23   13. He states he informed Defendant Cogburn he was stable, he promised to use the coping skills

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 23

he had learned, including the steps in his individualized behavior plan, and he promised that if he started having negative symptoms as a result of coming off the medication, he would inform staff, seek help and resume the medications. Dkt. 192 at ¶ 14. Plaintiff also states that he met with his mental health therapist, Christine Pratt, later that day and that she encouraged him to take medications but told him that she did not consider him a danger to himself or others. *Id.* at ¶ 15. He states that the next day he was taken to the COA. *Id.* Plaintiff states the only reason Defendant Cogburn gave for his being placed in and held in the COA was because of incidents in 2006 and 2009, but that he did not mention anything else to suggest that Plaintiff was at that time dangerous to anyone. *Id.* at ¶ 21. Plaintiff states that the COA is a segregated housing unit, where there are significant restrictions on his liberty including that he is not allowed access to television, radio, writing materials, or personal state-issued clothing and personal hygiene items are severely restricted. *Id.* at ¶ 18. Plaintiff states that Defendant Cogburn "coerced" him into taking unwanted psychiatric medication on August 7, 2018, by telling him that he would never be allowed to leave the COA unless he took all the medications he was told to take.[8] *Id.* at ¶¶ 19 & 20.

Plaintiff cites to *U.S. v. Williams*, 356 F.3d 1045 (9th Cir. 2004) in support of his argument that Defendant Cogburn's actions constituted "coercion" to take antipsychotic medication against his will and violated his Due Process rights. In *Williams*, the Ninth Circuit

---

[8] The Court notes that Plaintiff states in his brief and declaration in opposition to Defendants' motion for summary judgment that when he was taken to the COA on August 2, 2018, Defendant Cogburn also told him he was being placed on a 72-hour emergency involuntary medication order and would be forcibly injected with the medication if he failed to take it voluntarily. Dkts. 191, 192. Plaintiff states in his declaration that he took medication orally from August 2-6, 2018 because he did not want to be forcibly injected with medication. Dkt. 192 at ¶¶ 19-22. It is somewhat unclear from the record whether such an emergency order was issued. However, Plaintiff does not include this as a separate claim in his fifth amended complaint and, accordingly, the Court does not consider it as such. *See* Dkt. 173; *Wasco Prods., Inc.*, 435 F.3d at 992; *Trishan Air, Inc.*, 635 F.3d at 435 & n.19.

addressed the issue of mandatory medication as a condition of supervised release and held that

"before a mandatory medication condition can be imposed at sentencing, the district court must

make on-the-record, medically-grounded findings that court-ordered medication is necessary to

accomplish one or more of the factors listed in 18 U.S.C. § 3583(d)(1) […and] [a]lso the court

must make an explicit finding on the record that the condition 'involves no greater deprivation of

liberty than is reasonably necessary.'" 356 F.3d at 1057 (citing 18 U.S.C. § 3583(d)(2)). In a

footnote, the Ninth Circuit opined that:

> *Harper* involved the forcible injection of antipsychotic drugs to convicted
> prisoners. 494 U.S. at 229, 110 S.Ct. 1028. Use of physical force to administer unwanted
> drugs is more intrusive, certainly, than coercing ingestion through the threat of
> incarceration should the defendant fail to comply with a compulsory order to take the
> medication. The recognition of a significant liberty interest in *Harper* and its progeny
> does not depend, however, upon the means used to compel administration of the drugs.
> *Harper* identified that interest as "avoiding the *unwanted* administration of
> antipsychotic drugs," *id.* at 221, 110 S.Ct. 1028 (emphasis added); *see also id.* at 213, 110
> S.Ct. 1028 (framing the question presented as being when "the State may treat a mentally
> ill prisoner with antipsychotic drugs *against his will* ") (emphasis added). That
> terminology applies equally to all forms of coercion. In describing Harper's interest in
> more detail, the Court relied only in passing on the forcible nature of the drugs'
> administration, commenting primarily on the side effects that result from "alter[ing] the
> chemical balance in a patient's brain." *Id.* at 229, 110 S.Ct. 1028. Those side effects are
> the same, of course, whether the medication is taken involuntarily under threat of adverse
> consequences for failing to do so or as a result of forcible administration. *Sell* confirmed
> this reading of *Harper* by treating "a court order to the defendant backed by the contempt
> power" as a form of involuntary medication, albeit one that is a "less intrusive means for
> administering the drugs" as compared with "more intrusive methods." 123 S.Ct. at 2185.

*Id.* at 1053, n. 10.

Plaintiff would have the Court read the footnote in *Williams* to hold that Defendant

Cogburn's statement to Plaintiff here, that Plaintiff would not be allowed to leave the COA

unless he took his medication as directed, violated Plaintiff's right to Due Process. However,

*Williams* itself does not identify or address what would qualify as "coercion" and implicate Due

Process beyond the threat of reincarceration that was specifically at issue in that case, and which

is not at issue here. Furthermore, the Court finds that even if Defendant Cogburn made the

statement Plaintiff describes, this single statement, in the context of the record does not establish that Plaintiff was "coerced" into taking medication such that Due Process was implicated. Rather, the contemporaneous medical evidence recorded at the time reflects that Plaintiff's psychiatric symptoms including hallucinations and thoughts of self-harm had increased when he stopped taking his medication in late July/early August, that he was moved to the COA out of concern for his safety, that his symptoms improved when he resumed taking his medications in the COA in early August, and that he was released when he was found to have stabilized psychiatrically and to no longer be at risk of self-harm.

Although Plaintiff asserts he was "stable" when he met with Defendant Cogburn on August 1, 2018[9] to discuss having stopped his medication four days earlier, he does not specifically rebut or deny Defendant Cogburn's declaration and contemporaneous treatment note and Conditions of Confinement note reflecting that at that time Plaintiff also endorsed auditory hallucinations, command type, instructing himself to hurt himself, admitted to isolating himself in his cell on July 29, 2018, to refrain from cutting his left arm, that on July 31, 2018 he requested a four-hour cell confinement as he "intensely wanted to cut [his] left arm"[10], and that Plaintiff reported having a history of auditory hallucinations to hurt himself/others, paranoia, and delusions.[11] Plaintiff also does not deny that in the past when off his medication he murdered a

---

[9] The Court notes that Defendant Cogburn's treatment note does acknowledge Plaintiff's own self-assessment that he felt "stable" on August 1, 2018. Dkt. 186 at Ex. 2.

[10] The Court notes that Defendant Cogburn's August 2, 2018 treatment note references a July 29, 2018 instance where Plaintiff said he isolated himself to refrain from cutting his left harm while his August 2, 2018 Conditions of Confinement note references an instance on July 31, 2018, where Plaintiff requested a four-hour cell confinement because he "intensely wanted to cut [his] left arm." It appears that these notes refer to two separate instances of Plaintiff either self-isolating or specifically requesting cell isolation due to thoughts of self-harm. Plaintiff does not address or directly dispute that either instance occurred. But even if these treatment notes intend to reference the same occurrence, with one of them containing a mistake in the date, it would not alter the Court's analysis and ultimate conclusion here.

[11] The Court acknowledges that Plaintiff and Defendant Cogburn do provide different versions of Plaintiff's response on August 1, 2018, as to whether he would seek help if his psychiatric symptoms

cellmate and attempted to murder another inmate. Plaintiff's statement that he was "stable"

appears to reflect at most a difference of opinion from Defendant Cogburn regarding Plaintiff's

psychiatric state and risk of self-harm, but this in and of itself does not establish a constitutional

violation or raise a genuine issue of material fact in the face of the evidence presented by

Defendants.[12] Even if Plaintiff disagrees with Defendant Cogburn's medical assessment and

opinion, the unrebutted evidence in the record supports Defendant Cogburn's reasonable belief

that Plaintiff was at risk of self-harm. In other words, even accepting Plaintiff's self-assessment

that he was "stable" as true, given the increased psychiatric symptoms and thoughts of self-harm

reflected in Dr. Cogburn's treatment notes, and which are not specifically rebutted by Plaintiff,

the evidence in the record reflects that Plaintiff was moved to the COA, in accordance with DOC

Policy, because Defendant Cogburn was legitimately concerned for Plaintiff's safety.

　　　　The treatment notes of both Defendant Cogburn and non-Defendant Dr. Bloomingdale

recorded at the time, also reflect their observation that historically, and in late July/early August,

Plaintiff's psychiatric symptoms increased when he stopped taking his medications and

---

increased. Plaintiff stated he "promised" Defendant Cogburn he would inform staff, seek help and resume medications if he was experiencing negative symptoms from ceasing his medications, while Defendant Cogburn's declaration and contemporaneous treatment note state that Plaintiff indicated that only "maybe" he would seek help if he began experiencing suicidal ideation/homicidal ideation. But even if Defendant Cogburn was incorrect regarding Plaintiff's response to this question, when considered along with the undisputed context and background facts of the record as a whole, including Plaintiff's reported hallucinations and expressed desire to self-harm, this inconsistency alone does not warrant denial of summary judgment. *See Emeldi,* 698 F.3d at 728-29.

[12] Plaintiff also states that he met with his therapist Ms. Pratt later in the day on August 1, 2018, and that she encouraged him to take his medication but indicated that she did not consider him a danger to himself or others. Dkt. 192 at ¶ 15. But Plaintiff submits no declaration from Ms. Pratt herself regarding her assessment on August 1, 2018, and the conclusory assertion as relayed by Plaintiff that she did not consider Plaintiff a danger to himself or others is unsupported by any facts. Such a conclusory statement is insufficient to rebut Defendants' evidence, specifically Defendant Cogburn's specific observations and findings regarding Plaintiff's symptoms and behaviors supporting his opinion that Plaintiff was at risk of self-harm.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 27

1   improved when he took his medications and that Plaintiff had difficulty recognizing this

2   connection. As noted above, the record also reflects that Plaintiff had previously become

3   psychiatrically unstable and violent when off his medications and had murdered his cellmate and

4   attempted to murder another inmate, and that Defendant Cogburn was aware of this history. In

5   the context of this psychiatric medical history, a single a statement by Defendant Cogburn that

6   Plaintiff would not be released from the COA (where the record shows he was placed due to

7   Defendant Cogburn's concerns about Plaintiff's potential for self-harm) unless he took his

8   medication as directed, is insufficient to establish a Due Process violation. Rather, such a

9   statement, even if made, when taken in the context of the record, is perhaps most reasonably

10  interpreted to reflect Defendant Cogburn's medical opinion at the time that Plaintiff was unlikely

11  to stop experiencing significant psychiatric symptoms and posing a risk of self-harm unless he

12  resumed his medication. Even if construed as a threat, the Court notes that generally a verbal

13  threat, without more, does not rise to the level of a constitutional violation. *Gaut v. Sunn*, 810

14  F.2d 923, 925 (9th Cir. 1987); *Bates v. Darling*, 2:21-cv-1613, 2022 WL 158581 (E.D. Cal., Jan.

15  18, 2022). Here, the record does not reflect that Plaintiff was in fact kept in the COA despite

16  consistent medical evidence that he was psychiatrically stable and not a risk to himself or others,

17  solely because he refused to voluntarily take his medication.

18       The Court also notes that, generally "[t]he Constitution itself does not give rise to a

19  liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson v.*

20  *Austin*, 545 U.S. 209, 221 (2005). However, a state created liberty interest in avoiding particular

21  conditions of confinement may arise from state policies or regulations where the conditions,

22  while not exceeding the sentence in such an unexpected manner as to give rise to protection by

23  the Due Process Clause of its own force, rise to the level of an "atypical and significant hardship

1    ... in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 483-84

2    (1995). Plaintiff notes that in the COA he had no access to television, radio or writing materials

3    or personal clothing items and that personal hygiene items were more restricted. However,

4    Plaintiff does not argue that his placement in the COA for 7 days constituted an "atypical and

5    significant hardship" such that his placement there alone would give rise to a liberty interest and

6    implicate Due Process procedural protections. *See Sandin*, 515 U.S. at 484. Nor does the record

7    here support such a finding. *Id.* at 475–76 (finding thirty days of administrative segregation did

8    not constitute an atypical and significant hardship); *Richardson v. Runnels*, 594 F.3d 666, 672

9    (9th Cir. 2010) (applying *Sandin* and finding imposition of administrative segregation for sixteen

10   days did not constitute an "atypical and significant hardship in relation to the ordinary incidents

11   of prison life"); *Bryant v. Cortez,* 536 F.Supp.2d 1160, 1166 (C.D. Cal. 2008) (holding that

12   eighteen month confinement in administrative segregation that included reduction in exercise,

13   shower, hygiene, and visitation privileges, as well as prevented prisoner from participating in

14   vocational, educational, and recreational programs was not an atypical and significant hardship);

15   *Dickson v. Valenzuela*, Case No. CV 14-6954, 2016 WL 7187628, at *12-13 (C.D. Cal. Nov. 4,

16   2016) (finding no protected liberty interest for six month stay in administrative segregation

17   where plaintiff was locked down for 23 hours a day and received no phone calls or

18   visits), *adopted by* 2016 WL 7187293 (C.D. Cal. Dec. 9, 2016).

19           Defendants also argue that, alternatively, they are entitled to summary judgment based on

20   qualified immunity. Unless plaintiff makes a two-part showing, qualified immunity shields

21   government officials from liability on claims for damages under § 1983. The plaintiff must show

22   both: (1) the official(s) violated a federal statutory or constitutional right, and (2) the

23   unlawfulness of their conduct was "clearly established at the time" meaning that, at the time of

1   the official's conduct, the law was sufficiently clear that every reasonable official would

2   understand that what he is doing is unlawful. *City of Escondido v. Emmons*, 139 S.Ct. 500

3   (2019); *District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2018).

4          When qualified immunity is reviewed in the context of a defense motion for summary

5   judgment, the evidence must be considered in the light most favorable to the plaintiff with

6   respect to central facts. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). If there is a

7   genuine issue of material fact concerning both: (1) Whether it would be clear to a reasonable

8   officer that their conduct was unlawful under the circumstances they confronted, and (2)

9   Whether the defendant's conduct violated a constitutional right then summary judgment granting

10  qualified immunity is not appropriate. *Bonivert v. City of Clarkston*, 883 F.3d 865, 871-72 (9th

11  Cir. 2018); *Moran v. State of Wash.*, 147 F.3d 839, 844 (9th Cir. 1998) ("[T]he plaintiff bears the

12  burden of proving that the rights she claims were 'clearly established' at the time of the alleged

13  violation.").

14         To determine whether there was clearly established law, the Court has stated, "[w]hile

15  there does not have to be a case directly on point, existing precedent must place the lawfulness of

16  the particular [action] beyond debate"; and the Court has also observed, "there can be the rare

17  obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though

18  existing precedent does not address similar circumstances." *Wesby,* 138 S.Ct. at 590 (internal

19  citations and quotation marks omitted). A clearly established right exists if "controlling authority

20  or a robust consensus of cases of persuasive authority" have held, on facts that are close or

21  analogous to the current case, that such a right exists. *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th

22  Cir. 2019). "Clearly established law" should not be defined at a high level of generality; it must

23

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 30

1    be "particularized" to the facts of the case. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017);

2    *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

3    Here, Plaintiff points to no clearly established law, nor can the Court locate any, holding,

4    on facts that are closely analogous to the current case, that Due Process is implicated. The Court

5    is unaware of any case holding that Due Process is implicated by a statement from a provider

6    that a Plaintiff would not be released from close custody or a higher security level of

7    confinement if he did not take his psychiatric medication where the evidence shows Plaintiff was

8    placed at that custody level due to concern of self-harm after stopping his psychiatric medication

9    and he was in fact released from the higher custody level when he resumed his medication and

10   his psychiatric symptoms and concern of self-harm resolved. Accordingly, even if a

11   constitutional violation were established, Defendants would be entitled to summary judgment

12   based upon qualified immunity.

13   In sum, the Court finds that Defendants are entitled to summary judgment as they have

14   met their prima facie burden and Plaintiff fails to raise a genuine issue of material fact as to

15   whether his Due Process rights were violated by Defendant Cogburn's actions. Alternatively, the

16   Court finds Defendants are entitled to summary judgment based on qualified immunity with

17   respect to Plaintiff's claim for damages.[13] Defendants' motion for summary judgment with

18   respect to this claim as against Defendant Cogburn is granted.

19   Defendants also move for summary judgment seeking dismissal of all claims against

20   Defendants Rainer and Warner on the grounds that Plaintiff fails to show they personally

21   participated in or otherwise caused the alleged constitutional violation. Dkt. 190. Plaintiff alleges

22

23

---

[13] The Court notes that it appears Plaintiff only seeks monetary damages, attorney's fees and costs, but does not seek any form of injunctive relief. Dkt. 173.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 31

1    that Defendants Rainer and Warner are liable because they "ratified" Defendant Cogburn's

2    constitutional violation by denying Plaintiff's grievances. Dkt. 173. Because the Court finds

3    Defendant Cogburn did not violate Plaintiff's constitutional rights, Defendants Rainer and

4    Warner are also not liable and Defendants' motion for summary judgment is granted with respect

5    to these Defendants as well.

6           The Court notes that even if Defendant Cogburn had been found to have violated

7    Plaintiff's Due Process rights, Defendants Rainer and Warner would still be entitled to summary

8    judgment. To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must show: (1) he

9    suffered a violation of rights protected by the Constitution or created by federal statute, and (2)

10   the violation was proximately caused by a person acting under color of state law. *See Crumpton*,

11   947 F.2d at 1420. The first step in a § 1983 claim is therefore to identify the specific

12   constitutional right allegedly infringed. *Albright*, 510 U.S. at 271.

13          To satisfy the second prong, a plaintiff must show the individually named defendant

14   caused, or personally participated in causing, the alleged harm. *See Leer v. Murphy*, 844 F.2d

15   628, 633 (9th Cir. 1988); *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

16   As such, in a § 1983 action, "supervisory officials are not liable for actions of subordinates on

17   any theory of vicarious liability." *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989) (citing

18   *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). Rather, a supervisor may only be liable

19   "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2)

20   a sufficient causal connection between the supervisor's wrongful conduct and the constitutional

21   violation." *Id.* at 646 (citation omitted). Such liability can be imposed, for instance, if the

22   supervisor knew or reasonably should have known his subordinates would cause constitutional

23   injury, or if his own conduct showed reckless indifference to the rights of others. *Starr v. Baca*,

1    652 F.3d 1202, 1207-08 (9th Cir. 2011) (internal citations and quotation marks omitted); *see also*

2    *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (a supervisor is only liable for his subordinates'

3    constitutional violations if he "participated in or directed the violations, or knew of the violations

4    and failed to act to prevent them").

5          Here, the grievance that was reviewed by Defendants Rainer and Warner related to a

6    separate alleged incident on August 14, 2018. Thus, it does not appear that Defendants Rainer and

7    Warner would have been alerted to Plaintiff's concerns regarding Defendant Cogburn's alleged

8    statement on August 7, 2019, which is the incident challenged in the fifth amended complaint. But

9    even if the grievance could be construed to alert Defendants Rainer and Warner to the Plaintiff's

10   concerns about the August 7, 2018, statement by Defendant Cogburn, in general, "[i]n order to be

11   liable under § 1983 a prison official must have done something more than fail to correct an

12   alleged violation brought to their attention in a grievance after the violation has

13   occurred." *Hardney v. Moncus*, No. 215CV1842, 2016 WL 7474908, at *6 (E.D. Cal. Dec. 28,

14   2016) (*citing Taylor*, 880 F.2d at 1045 (upholding dismissal of defendant when plaintiff failed to

15   provide facts showing defendant knew of and failed to prevent constitutional violations)); *Anaya*

16   *v. CDCR*, No. 1:16-cv-00040, 2016 WL 7178527, at *5, 2016 U.S. Dist. LEXIS 170202, at *12

17   (E.D. Cal. Dec. 8, 2016) ("[T]he denial of a prisoner's administrative appeal generally does not

18   cause or contribute to the underlying violation." (citing *George v. Smith*, 507 F.3d 605, 609 (7th

19   Cir. 2007)).

20         Here, Plaintiff's allegation that Defendants Warner and Rainer violated his rights by

21   failing to correct a Due Process violation that had already occurred when he brought it to their

22   attention through the grievance process is not sufficient to state a claim. Plaintiff's fifth amended

23   complaint limits his claim to Defendant Cogburn's statements and behavior while Plaintiff was

1    in the COA on August 7, 2018. Plaintiff's complaint also alleges Defendants violated his Due

2    Process rights "through a policy and/or custom and practice of coercing Plaintiff to take

3    unwanted psychiatric medication through threat of transfer to the COA" but pleads insufficient

4    facts and presents insufficient evidence to indicate that such a policy existed or that Defendants

5    Rainer and Warner participated in or directed any alleged constitutional violations, or knew of

6    *ongoing* violations and failed to act to prevent them.

7          Defendants also move for summary judgment seeking dismissal of all claims against

8    Defendant Grey on the grounds that Plaintiff fails to show she personally participated in or

9    caused the alleged constitutional violation. In his brief and declaration in opposition to

10   Defendants' motion, Plaintiff alleges that Defendant Grey is liable because she created a practice

11   or culture wherein the importance of medication compliance was emphasized regularly. Dkts.

12   191 & 192. Plaintiff alleges Defendant Grey conditioned prisoner's participation in certain

13   programs on the prisoners being medication compliant. *Id.* However, Plaintiff does not include

14   these allegations as separate claims in his fifth amended complaint. Furthermore, the Court has

15   concluded that Defendant Cogburn's actions did not violate his constitutional rights and,

16   accordingly, Defendant Grey cannot be liable for somehow participating in or causing a violation

17   that did not occur.

18         Even if Defendant Cogburn had violated Plaintiff's constitutional rights, Plaintiff fail to

19   identify any evidence in the record that Defendant Grey created, in any way participated in, or

20   was aware of or reasonably should have been aware of a policy of threatening placement in or

21   denying release from the COA if prisoners refused to take their medication. The Court notes that

22   Defendants also present evidence in reply indicating that Defendant Grey was not, in fact,

23   Defendant Cogburn's supervisor. Dkts. 194, 195 at Ex. 1. Thus, even if Plaintiff had properly

1    pled a claim against Defendant Grey, which it appears to the Court he did not, Plaintiff provides

2    insufficient facts or evidence that Defendant Grey violated Plaintiff's constitutional rights related

3    to his August 2018 placement in the COA.

4          Accordingly, Defendants' motion for summary judgment is also granted with respect to

5    Plaintiff's claim against Defendant Grey as well.

6    **D.    Failure to Observe Plaintiff's Procedural Rights Before Involuntary Medication**

7          **(Claim 3)**

8          Plaintiff also argues Defendants violated his Due Process rights by failing to follow

9    certain DOC procedures with respect to his Involuntary Antipsychotic Hearings (IAH). Dkt. 173.

10         With respect to the February 7, 2019, 14-day hearing Plaintiff's fifth amended complaint

11   gives the following chronological summary:

12         On February 7, 2019, about 11:30 a.m., Connie Sais served Plaintiff with the Decision of
     Involuntary Antipsychotic Hearing Committee, which ordered 14 days of involuntary
13   medication. On February 13, 2019, Plaintiff complained in writing to the Mental Health
     Director that he was not yet served the Involuntary Antipsychotic Hearing Minutes (DOC
14   Form 13-502) or the Receipt of Minutes of Involuntary Antipsychotic Hearing
     Committee and Appeal Procedures (DOC Form 13-328). In that complaint, Plaintiff also
15   sought to appeal the committee's decision of February 7, 2021. On February 14, 2019, at
     9:13 a.m., Defendant Joplin served on Plaintiff a copy of the Receipt of Minutes of
16   Involuntary Antipsychotic Hearing Committee and Appeal Procedures (DOC Form 13-
     328). At the same time, Defendant Joplin also served on Plaintiff a copy of the 14-day
17   Involuntary Antipsychotic Hearing Minutes (DOC Form 13-502). This copy of the 14-
     day hearing minutes served on Plaintiff was missing signatures of William Collins and
18   Connie Sais. Also on February 14, 2019, Plaintiff submitted to Defendant Joplin on DOC
     Form 13- 328 a signed notice of appeal of the 14-day Involuntary Antipsychotic Hearing
     decision of February 7, 2019.

19
     *Id.* Plaintiff states that when he reviewed his medical records maintained by DOC, he discovered
20
     certain discrepancies between the documents maintained by DOC and the copies of the same
21
     documents served on Plaintiff related to the hearings of February 7, 2019. *Id.*; Dkt. 192.
22
     Specifically, the version of hearing minutes given to Plaintiff on February 14, 2010, were not
23
     signed by Connie Sais or William Collins. *Id.* The version of these documents in the medical

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 35

records were signed by Connie Sais on February 19, 2019 and by William Collins on February 14, 2019, but the statement of Mr. Collins differed from what was served on Plaintiff. *Id.* There was only one copy of the receipt of minutes of involuntary antipsychotic hearing committee and appeal procedures which was signed by Plaintiff on February 14, 2019, and the version dated February 13, 2019, where Plaintiff indicates he objected to not having been served with minutes or appeal procedure by that date, was not in the medical records. *Id.*

With respect to the February 21, 2019, 180-day hearing, Plaintiff's fifth amended complaint alleges:

> On February 20, 2019, Defendant Joplin served on Plaintiff a 24-hour notice of a 180-day Involuntary Antipsychotic Hearing on DOC Form 13-330. The copy of the 24-hour notice served on Plaintiff is signed by both Plaintiff and Defendant Joplin, who signed twice to attest that she both served the document on Plaintiff and read to him his hearing rights. All three signatures were dated February 20, 2019. Plaintiff's signature reflects a time of 3:08 p.m. Both of Defendant Joplin's signatures on this copy reflect a time of 2:55 p.m. That notice on February 20, 2019, included an Involuntary Antipsychotic Report from each of Lamin Sanneh and Robert Carsrud on DOC Form 13-329. On February 21, 2019, the audio recorded 180-day Involuntary Antipsychotic Hearing was held by a committee composed of William Collins, Eric Rosmith, Ashley Kennedy, and Connie Sais. Lamin Sanneh and Robert Carsrud attended as witnesses. On February 21, 2019, about 3:30 p.m., Plaintiff received on DOC Form 13-327 the Decision of Involuntary Antipsychotic Hearing Committee ordering 180 days of involuntary medication. On February 26, 2019, Defendant Joplin served on Plaintiff a copy of the Receipt of Minutes of Involuntary Antipsychotic Hearing Committee and Appeal Procedures (DOC Form 13-328) pertaining to the hearing of February 21, 2019. Plaintiff also was served a copy of the 180-day Involuntary Antipsychotic Hearing Minutes and attached findings. Plaintiff's copy of the minutes and attached findings for the hearing of February 21, 2019, contained signed statements of committee members Rosmith and Kennedy but was unsigned by Collins on his statement and by chairperson Kennedy on the decision of the committee. This copy of the minutes also erroneously reflected a hearing time of 10:20 a.m. and noted in the first sentence that Defendant Joplin read Plaintiff his hearing rights on February 20, 2019, at 2:25 p.m. On February 26, 2019, Plaintiff served on Defendant Joplin a type-written notice of appeal for the decision for 180 days of involuntary medication. On March 7, 2019, Defendant Rainer upheld Plaintiff's appeal.

Dkt. 173.

Plaintiff states that when he reviewed his medical records maintained by DOC, he also discovered certain discrepancies between the documents maintained by DOC and the copies of

the same documents served on Plaintiff related to the hearing on February 21, 2019. *Id.*; Dkt. 192. He states the medical records version of the Notice of Involuntary Antipsychotic Hearing (24-hour) dated February 20, 2019, was altered in the field reflecting the time that Defendant Joplin read Plaintiff his hearing rights, to falsely reflect that Plaintiff's rights were read at 2:25pm. *Id.* He asserts the medical records version of the 180-day Involuntary Antipsychotic Hearing Minutes signed on February 27, 2019, by the chairperson shows a hearing time of 2:45 pm. *Id.* He indicates the medical records version 180-day Involuntary Antipsychotic Hearing Minutes Statement of William Collins is signed and dated February 27, 2019 and the body of this copy of Williams' statement is also different from the copy served on Plaintiff. *Id.* Plaintiff also states that the medical records version of Plaintiff's two-page appeal dated February 26, 2019, was altered in that the opening paragraph was removed, as were the numbers assigned the to second and third paragraphs. *Id.* In making these alterations, Plaintiff states that Defendant Joplin intentionally removed entirely the section of Plaintiff's appeal that made reference to Defendant Joplin's failure to comply with his Due Process rights in failing to read him his hearing rights at least 24 hours prior to the hearing. *Id.* He states that the medical records copy of this appeal with the redactions was sent by Defendant Joplin to Defendant Rainer and Bruce Gage on February 27, 2019. *Id.*

Plaintiff argues that Defendants' violation of DOC policies related to the required amount of notice for the hearing and the appeal procedures for the IAH decisions violated his procedural Due Process rights under the Fourteenth Amendment. Defendants argue that DOC policies do not have the force of law and so any alleged failure to follow policy does not necessarily implicate a constitutional interest.  Dkt. 190 at 13 (citing *Joyce v. State, Dep't of Corr.*, 155 Wash.2d 306, 323, 119 P.3d 825 (2005) (the Department's policy directives are not promulgated

1    pursuant to legislative delegation, and so they do not have the force of law)). Alternatively,

2    Defendants argue they are entitled to summary judgment based on qualified immunity. *Id.*

3          The Supreme Court has determined that, in the context of involuntary antipsychotic

4    medication, procedural due process is satisfied if the inmate is provided with notice, the right to

5    be present at an adversarial hearing, and the right to present and cross-examine witnesses.

6    *Harper*, 494 U.S. at 235. Here, Plaintiff's fifth amended complaint does not allege that Plaintiff

7    was not afforded these basic rights in the context of either the 14-day or the 180-day hearing.

8    Dkt. 173. Rather, Plaintiff argues Defendants failed to provide him with the full 24-hour notice

9    for his 180-day hearing, although he does acknowledge receiving slightly less (it appears

10   approximately 20-25 minutes less) than 24-hours notice[14], and failed to follow DOC policy in

11   the context of his appeal of the IAH decisions in various ways.

12         Generally, state departmental regulations do not themselves establish a federal

13   *constitutional* violation. *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (citing *Case v.

14   Kitsap County Sheriff's Dep't*, 249 F.3d 921, 930 (9th Cir. 2001)); *Gardner v. Howard*, 109 F.3d

15   427, 430 (8th Cir. 1997) ("[T]here is no § 1983 liability for violating prison policy. [Plaintiff]

16   must prove that [the official] violated his constitutional right ....")); *see also Gagne v. City of*

17

18   ---

     [14] Plaintiff argues that *Harper* requires 24-hour notice of the hearing in order to satisfy Due Process. Dkt.
19   191 at 15; 494 U.S. at 229. Plaintiff cites to a case from the district court of Maryland, *Mbewe v. Dep't of
     Pub. Safety*, No. ELH-14-3478, 2017 WL 1104661 (D. Md., Mar. 24, 2017), which interpreted *Harper* as
20   requiring 24-hour notice. Dkt. 191. However, it appears to the Court that while the prison policy that was
     challenged in *Harper* did require 24-hour notice, in deciding that the requirements of Due Process were
     satisfied by the policy, the Court held only that Due Process was satisfied because the policy provided for
21   "notice, the right to be present to an adversary hearing, and the right to present and cross-examine
     witnesses." 494 U.S. at 229. The Court did not explicitly find that Due Process was satisfied only by 24-
22   hour notice. *Id.* Other cases have also articulated the standard set out in *Harper* as holding that the
     requirements of Due Process are met in the context of involuntary administration of medication by
23   "notice, the right to be present to an adversary hearing, and the right to present and cross-examine
     witnesses." *See, e.g., Hausken v. Riebman*, C12-1776-TSZ, 2013 WL 3814368 (W.D. Wash. July 22,
     2013); *Sheppard v. Cohen*, No. 1:11-cv-00535, 2013 WL 1006761 (E.D. Cal., Mar. 13, 2013).

*Galveston*, 805 F.2d 558, 560 (5th Cir. 1986) ("[A]llegations about the breach of a ... regulation are simply irrelevant to the question of an official's eligibility for qualified immunity in a suit over the deprivation of a constitutional right."). The Court acknowledges that state regulations may, under some circumstances, create liberty interests requiring Due Process protections. *See Sandin*, 515 U.S. 472 (holding that due process liberty interests created by prison regulations will be generally limited to freedom from restraint which, while not exceeding sentence in such unexpected manner as to give rise to protection by due process clause of its own force, nonetheless imposes atypical and significant hardship on inmate in relation to ordinary incidents of prison life). But, if a state statute has created a liberty interest, the minimum requirements of Due Process are established by federal law, not by state statute. *Green v. Dormire*, 691 F.3d 917, 921 (8th Cir. 2012) (citing *Vitek v. Jones*, 445 U.S. 480, 491(1980). Here, the liberty interest at issue was recognized in *Harper* as that "in avoiding the unwanted administration of antipsychotic drugs", and the minimum requirements of procedural Due Process were found by *Harper* to be met where there was notice, the right to be present at an adversarial hearing, and the right to present and cross-examine witnesses. 494 U.S. at 235. As discussed above, Plaintiff's fifth amended complaint does not raise any claim that those minimum requirements were not met in this case.[15]

Accordingly, the Court finds that Defendants' alleged failure to follow the specific DOC policy procedures Plaintiff challenges above fails to establish a constitutional violation.[16]

---

[15] The Court also notes that Plaintiff has not argued or shown that the more specific DOC policy requirements Plaintiff alleges were not followed created a separate or additional liberty interest such that Due Process was implicated by Defendants' failure to follow those more specific procedural requirements discussed above.

[16] In making this finding the Court does not intend to imply that the violations of DOC policy alleged by Plaintiff are not deeply concerning or problematic (particularly with respect to the allegation of altered IAH appeal documents), but only that Plaintiff fails to establish a constitutional violation.

1    The Court also notes that Plaintiff's appeal of the 180-day hearing decision was upheld.

2    Defendants submit the declaration of Defendant Rainer who upheld Plaintiff's appeal of the 180

3    day IAH decision. Dkt. 188. Defendant Rainer states:

> My understanding is that for the appeal he submitted from his 180-day IAH on February 21, 2019, Mr. Perez claims that the appeal submitted to me and to Dr. Gage was missing information, including information about his claim that he was not given 24-hours' notice of the hearing. However, his appeal was upheld, and the Committee's decision overturned, and so there is no change in result that would have or could have happened if his appeal had contained other information about additional claimed procedural violations. My role in reviewing IAH appeals is to review the procedural aspects of the decision, and I review all procedure whether specifically appealed or not. A patient could write, "I appeal," with no reasons given, and I would still review all procedural elements of the decision below. There is also no cumulative effect for reviewing the procedures in an IAH appeal. If there is one procedural violation, I would decide that process was not followed, if there are two or more procedural violations, I would still decide that process was not followed. In Mr. Perez's case, the Chairperson of the IAH Committee on February 2, 2019, did not have the qualifications as required per policy, and even though Mr. Perez did not appear to call this procedure out specifically in his appeal … it was still my basis for overturning the Committee's decision.

*Id.* at 5-6.

Generally, "[t]here is no denial of due process if the error the inmate complains of is corrected in the administrative appeal process." *Morissette v. Peters*, 45 F.3d 1119, 1122 (7th Cir. 1995) (citing *Harper v. Lee*, 938 F.2d 104, 105 (8th Cir. 1991); *see Zacharie v. Chirila*, 362 F. App'x 586, 587 (9th Cir. 2010) ("[*Zinermom v. Burch*, 494 U.S. 113, 126 (1990) held] that a constitutional violation is not complete 'unless and until the State fails to provide due process' within the established administrative or statutory scheme[.]"); *see Torricellas v. Poole*, 954 F.Supp. 1405, 1414 (C.D. Cal. 1997) ("Where a procedural error has been corrected in the administrative process, as it was here, there has been no compensable due process violation. The administrative appeal is considered part of the process afforded, and any error in the process can be corrected during that appeals process without necessarily subjecting prison officials to

1    liability for procedural violations at lower levels."), *aff'd,* 141 F.3d 1179 (9th Cir. 1998)

2    (unpublished) (affirming for the reasons stated by the district court).[17]

3           Here, Plaintiff's appeal of the 180-day hearing decision was upheld and the decision to

4    involuntarily medicate overturned, albeit on different grounds than the DOC policy violations

5    raised by Plaintiff here.

6           As such, it appears that, on this basis as well, Defendants would be entitled to summary

7    judgment with respect to Plaintiff's Due Process challenge to the 180-day hearing proceedings.

8           Accordingly, Defendants' motion for summary judgment is granted with respect to these

9    claims.[18]

10   **E.      Failure to Adequately Supervise Defendant Joplin (Claim 4)**

11          Because the Court finds Defendants are entitled to summary judgment on the grounds

12   that there was no constitutional violation with respect to the alleged violations of DOC policy in

13   the context of Plaintiff's IAHs and subsequent appeals, primarily allegedly perpetrated by

14   Defendant Joplin, the Court finds the supervisory Defendants also did not violate the constitution

15   in failing to properly supervise or train Defendant Joplin to adhere to DOC policy.

16   //

17   //

18

19   _____

20   [17] The Court notes that in his brief and declaration in opposition to Defendants' motion for summary judgment Plaintiff also refers to alleged procedural errors in the context of the hearings themselves including not allowing him a sufficient opportunity to cross-examine witnesses, not allowing him to fully present his case, and failing to offer him an adjournment so Plaintiff could present a specific witness. Dkts. 191 & 192. However, Plaintiff does not include these as separate claims in his fifth amended complaint and, accordingly, the Court does not consider them as such. *See* Dkt. 173; *Wasco Prods., Inc.,* 435 F.3d at 992; *Trishan Air, Inc.,* 635 F.3d at 435 & n.19.

21

22

23   [18] Because the Court finds Defendants are entitled to summary judgment on the grounds that there was no constitutional violation, it does not reach Defendants' arguments with respect to qualified immunity on these claims.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 41

**F.     Defendant Beck**

Plaintiff also names Shelley Beck as a Defendant in the action. Plaintiff's fifth amended complaint is devoid of any specific allegations against Defendant Beck. Defendants move for summary judgment seeking to dismiss Plaintiff's claims against Defendant Beck on the grounds that Plaintiff fails to show Defendant Beck personally participated in violating or otherwise caused the violation of Plaintiff's constitutional rights. Dkt. 190. The evidence in the record reflects that Defendant Beck's involvement was limited to responding to a kite and providing information in a grievance investigation initiated by Plaintiff's filing of a grievance related to the alleged alterations of his medical records related to his IAH hearing. Plaintiff identifies nothing in the record to demonstrate that Defendant Beck personally participated in or otherwise caused a violation of Plaintiff's constitutional rights. As Plaintiff has not made any specific allegations against Defendant Beck in the fifth amended complaint or offered facts or evidence that would indicate she personally participated in or caused any constitutional violation, Defendants' motion for summary judgment is granted and the claims against Defendant Beck are dismissed.

## CONCLUSION

For the above reasons, Defendants' amended motion for summary judgment (Dkt. 190) is GRANTED and Plaintiff's claims against all Defendants are dismissed with prejudice.

DATED this 8th day of July, 2022.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge